HARRY T. SCHACHNE, Plaintiff, *v.* THE CORPORATION OF THE CHAMBER OF COMMERCE, Defendant.

(Municipal Court of the City of New York, Borough of Manhattan, First District, January, 1918.)

Bonds — provisions of — perpetual loan — "The Corporation of the Chamber of Commerce of the State of New York" — actions — contracts.

Where a building fund subscription non-cumulative income bond issued by "The Corporation of the Chamber of Commerce of the State of New York," upon the express condition and understanding that the corporation might call in, pay off and cancel the bond by returning to the person who may then be the owner thereof the amount of said subscription, does not fix a particular date for repayment, a provision that interest shall be paid "until the full amount of said subscription shall be returned and this bond redeemed as herein provided" determines the rights and obligations of the parties in regard to the repayment of the loan; the bond therefore provides for a perpetual loan.

Where in an action to recover the face value of such a bond, with interest, it appears that seventeen years have elapsed since the issue of the series of bonds and not one subscriber has demanded repayment of his subscription and that the original owner of the bond in suit held it for four years until his death and his trustees for twelve years thereafter, the legal inference may be drawn that the trustees sold the bond at auction only for the purpose of winding up the estate.

The fact that during these many years not one dollar was ever demanded of defendant in repayment of an issue of bonds

in excess of $1,000,000, is convincing evidence of the practical construction of the agreement by the parties themselves, and any doubt as to the meaning of the contract will be resolved in favor of defendant which refused to accede to a demand for the payment of the bond, with interest, and the complaint will be dismissed on the merits.

Action to recover the face value of a bond, together with interest.

Jacob Friedman, for plaintiff.

Cohen, Gutman & Richter (Julius Henry Cohen and Theodore B. Richter, of counsel), for defendant.

Spiegelberg, J.   The plaintiff seeks to recover the face value of a $1,000 bond, together with interest. The bond is one of a series issued by the defendant and acquired by the plaintiff under the following circumstances.

The defendant is a domestic corporation. Its charter dates back to the year 1768. It was subsequently confirmed and amended by special acts of the legislature. The main purpose of the chamber of commerce is " to promote and extend just and lawful commerce." It has become one of the foremost agencies in the development of the commerce of the city of New York. It does not engage in any enterprise for financial gain of its own or that of its members. For more than a century the company's activities were conducted from leased quarters. The advisability of securing a building of its own having become apparent it was unanimously decided at a meeting of the chamber of commerce held on May 6, 1897, " that the time had come when this Chamber should aim to provide itself a permanent home." Prior to that date the sum of $248,500 had already been subscribed towards the formation of a building fund. After the meeting

of May 6, 1897, a circular letter dated May 7, 1897, together with an addendum dated December 28, 1897, was sent by the building committee to the members of the corporation calling for subscriptions to the building fund.  The letter, after stating its purposes, continues:

"With this end in view, your Committee beg to submit the following:

"*First.* The minimum amount required is one million of dollars, and subscriptions shall not be binding until that sum in the aggregate has been pledged.

"*Second.* Subscribers shall receive certificates of indebtedness for their subscriptions, which will be changeable into non-cumulative income bonds, bearing such rate of interest, but not exceeding three per cent. per annum, as may be conveniently paid from each year's surplus income, reserving to the Chamber the right of redemption, upon thirty days' notice, at its own option.

"*Third.* Subscriptions may be made payable in equal payments of 3, 6, 9 and 12 months, at the option of subscribers, interest to accrue from the date of each payment.

"*Fourth.* When one million of dollars has been pledged the Committee will take up the question of location and construction, and submit the result of their deliberations to subscribers before taking final action.

"You are respectfully and earnestly invited to assist in furthering this good but long delayed work by making such subscription as you may think best. From the foregoing you will observe that *subscriptions are not asked for as gifts* but will receive in return the obligation of the Chamber, bearing such moderate rate of interest as can be conveniently paid from each year's surplus revenue after providing for

necessary expenses, and redeemable at the option of the Chamber after reasonable notice.

" Subscription blanks are enclosed herewith, which may be returned to any member of the Committee.

(Here follow the the names of the members of the Committee.)

*" December 28th,* 1897.

" P. S.   The above circular letter was prepared by your committee immediately after the meeting of the 6th of May.   Since then further subscriptions have been received (see other side), making the aggregate at this date $631,250 from 226 of our twelve hundred members.   To those who have not as yet responded, your Committee appeals, with abiding confidence, for the balance yet necessary to insure success.  .Attention is specially directed to the second clause of the ' Plan ' which declares *that subscriptions are not gifts,* but will be treated as direct obligations of the Chamber."

(Here follow the the names of the members of the Committee.)

Within a few years the building committee raised upwards of $1,000,000.   On March 27, 1901, the form of the bond to be issued to the contributors to the building fund was approved.   The bonds are dated May 1, 1901, and are in the following form:

" THE CORPORATION OF THE CHAMBER OF COMMERCE
" Of The State of New York

" Does hereby acknowledge that it has received from ........ the sum of One Thousand dollars, in payment of his subscription made to the Building Fund of the Chamber of Commerce, pursuant to the letter of the Building Committee dated May 7, 1897; in consideration whereof, The Corporation of the Chamber of Commerce of the State of New York does hereby bind itself and its successors, by these presents,

that it will each and every year hereafter, until the full amount of said subscription shall be returned and this bond redeemed as herein provided, pay unto him, his executors, administrators and assigns, on the first day of May, such interest, not exceeding three per cent. per annum, as may be conveniently paid from the year's surplus income after providing for necessary expenses; it being understood, however, that such interest may be determined each year, and shall not be cumulative in case a less amount than three per cent. shall be declared. This Bond is issued upon the express condition and understanding that the said, The Corporation of the Chamber of Commerce of the State of New York, may, at any time it may deem for its best interests, so to do, call in, pay off and cancel this bond by returning to the person who may then be the owner thereof the amount of the said subscription, provided that it shall have given not less than thirty days' written notice of its intention so to cancel the same, as hereinafter provided. This Bond is issued upon the further express condition and understanding that any and all payments of interest shall be made to the owner of record, as the same appears on the books of the obligor kept for that purpose, and that all assignments must be in writing, and filed with the obligor, upon receipt of which and production of this Bond the obligor will indorse upon the same the name of the assignee and note the change of ownership in its record; that all interest may be paid by mailing a cheque therefor to the owner of record hereof to the post-office appearing on the said books; that notice of the intention of the obligor to repay the said subscription may be given by notice mailed to such address; and that at the time designated in such notice for the return of the said subscription, as hereinabove provided, interest on this bond shall cease."

Each bond bears the indorsement: "Building fund subscription non-cumulative income bond."

In the early part of 1901 the defendant purchased the premises known as 51–65 Liberty street, and entered into a contract for the construction of the building thereon. The aggregate cost of the land and the building as erected exceeded the subscriptions by approximately $500,000. In order to meet the deficiency another bond issue was authorized in the year 1903. These bonds are of a character entirely different from the 1901 bonds. They need not be considered in the decision of this case.

Among the original subscribers to the building fund was one John Gibb, a member of the chamber of commerce, who duly received a $1,000, income bond, dated May 1, 1901. He died on August 27, 1905, and on May 17, 1917, the trustees appointed under his will offered the bond for sale at public auction. The plaintiff bought the bond and on May 23, 1917, procured a transfer thereof to his name on the books of the defendant. Thereupon he made a demand for the payment of the bond, and interest at the rate of six per cent. per annum, which was refused. He now brings this action for the enforcement thereof.

The plaintiff maintains that the bond was enforceable upon demand immediately upon its issue, or at least payable within a reasonable time after its issue, and that a reasonable time has elapsed. The bond does not fix a particular date for repayment. It is undoubtedly true that where a loan is repayable on demand the demand may be made immediately, and it is equally true that where the instrument provides for repayment, or where it may be gathered from the instrument that repayment was within the intention of the parties, but no time is fixed therefor, the loan is repayable within a reasonable time, dependent upon

the circumstances of the particular case.  The question to be determined is whether the subscriber to the fund who received the bond has the right to demand the repayment of his subscription, and, if so, when and on what contingency.  The bond is styled a non-cumulative income bond.  It makes the letter of the building committee of May 7, 1897, an integral part, and, in fact, all the conditions contained in the letter are incorporated in the bond.  The purpose for which the subscriptions were made is clear, and although it was particularly stated that they were not asked for as gifts it does not necessarily follow that for that reason the subscribers had the right to demand their subscriptions back either immediately or within a reasonable time.  The letter and the bond fix the rights of the parties.  The defendant obligates itself to pay such interest on each bond '' not exceeding three per cent. per annum as may be conveniently paid from the year's surplus income after providing for necessary expenses.''  As a matter of fact, interest was paid yearly at rates varying from one per cent. to three per cent.  Such interest was to be paid '' until the full amount of said subscription shall be returned and this bond redeemed as herein provided.''  In my opinion this clause determines the rights and obligations of the parties in regard to the repayment of the subscription, which is limited '' as herein provided.''  The bond is issued upon the express condition and understanding that the defendant '' may at any time it may deem for its best interests so to do, call in, pay off and cancel this bond by returning to the person who may then be the owner thereof the amount of said subscription,'' on giving thirty days' written notice of its intention of cancellation. The bond provides two contingencies for repayment, and none other.  One is the failure of the defendant to pay the stipulated

annual interest, the other the exercise of its option to pay off the bond. The occurrence of a failure to pay the interest, involving a breach of the defendant's agreement, would give the plaintiff or his assignees the right to rescind the contract. The other contingency is an optional redemption on the part of the defendant. The plaintiff's claim that the parties have not agreed upon the terms and conditions of repayment is correct in so far only as no definite date is set for repayment, but the conditions upon which it is to take place are clear and unmistakable. As has been pointed out, the right of the holders of the bonds to demand payment arises upon the default of the defendant to pay the stipulated interest or when the best interests of the defendant require the calling in of the bonds. The condition that " the subscription shall be returned and this bond redeemed as herein provided " is a condition just as strong as the one which was upheld in *Koster* v. *Lafayette Trust Co.*, 207 N. Y. 336, where it was provided that the money advanced was to be payable " whenever the surplus of said Trust Company shall exceed the sum of $150,000 " and the one in *Matter of Fechheimer, Fishel Co.*, 212 Fed. Rep. 357, where the repayment of the debenture bonds was made subordinate to claims of general business creditors.

The bond under consideration provides for a perpetual loan. This form of securities is rarely met with in this country, but though unusual it cannot be condemned on that ground. In England bonds with similar provisions are quite common. In 5 Ency. of Forms & Precedents, 92, it is said: "The peculiarity of a ' perpetual debenture ' is that it contains no provision for payment of the debenture holders' principal *at a fixed date;* payment is to be made on a contingency only — the happening of certain events

specified in the conditions — commonly default in payment of interest and winding up. Till one of these events takes place the security is not enforceable, though the company may redeem if the debenture reserves to it the right to do so. The advantage to the company of a perpetual debenture is that, so long as the company is a going concern and pays the debenture holders' interest, it need not trouble itself about providing for payment of the debenture holders' principal.'' See also to the same effect Manson on Debentures of Trading Companies (2d ed.), 44.

In 3 Palmer's Company Precedents (11th ed.), page 56, it is said: '' So too, it would seem, that where the company has power to borrow or raise money by the issue of debentures or *otherwise,* it may raise it by the issue of what are called perpetual debentures, i. e., debentures payable only in the event of winding-up, or after six months' default in payment of interest; and it may be that power to ' raise money by the issue of debentures ' is sufficient to justify the issue of perpetual debentures. No doubt a debenture imports a debt, and possibly an instrument under which the principal was never to be repaid could not properly be called a debenture, though debenture holders under the Company's Clauses Acts have been given by the Legislature only ' the fruit of the tree '; but perpetual debentures always do fix one or more contingencies in which the holder will be entitled to payment, and very commonly reserve power to the company to redeem at a premium on giving six months' notice. A debt such as this is not the less a debt because it is only to become payable in certain contingencies. It is still ' *debitum in praesenti solvendum in futuro.*' Even if debentures so framed are to be deemed to create only contingent debts, they are

still properly called debentures, for a contingent debt is well known to the law.''

The only doubt cast on the legality of irredeemable debentures in England arose from the contention that it cut off the company's power of redemption. The objection was not raised on behalf of the lender but of the borrower. Legislation was necessary to set at rest the doubt concerning the legality of debentures, irredeemable or perpetual in their nature. Palmer's Company Law (10th ed.) says, at page 313, on this point: '' For many years it has been quite common to issue debentures or debenture stock as ' perpetual ' or ' irredeemable,' meaning that such debentures were made payable only in the event of a winding-up or some serious default of the company. Sometimes, also, debentures and debenture stock were made payable at a remote period, such as fifty or a hundred years after issue. In cases like these, doubts often arose whether the securities were effective, or whether the indefinite or prolonged postponement of the right of redemption was not in effect a ' clog on the equity,' and, as such, void. See Company Precedents, Part III, p. 122, *et seq.* To quiet these doubts, and to bring the law into accord, with what it has commonly been taken to be, sect. 103 of the Act of 1908 enacts as follows:

'' 103. A condition contained in any debentures or in any deed for securing any debentures, whether issued or executed before or after the passing of this Act, shall not be invalid by reason only that thereby the debentures are made irredeemable or redeemable only on the happening of a contingency, however remote, or on the expiration of a period, however long, any rule of equity to the contrary notwithstanding.''

Reference is also made to Manson on Debentures

of Trading Companies (2d ed.) pages 373 and 374, and 3 Palmer's Company Precedents (11th ed.) page 58.

The earliest American case which deals with perpetual loans is *Union Canal Co.* v. *Antillo*, 4 Watts & Serg. (Pa.) 553. The bond in that case read: " Union Canal Loan. Certificate No. 54. These presents do certify that there is due from the Union Canal Company of Pennsylvania to Charlotte B. D. Antillo, or her assigns, the sum of $200, bearing an interest of 6 per cent. per annum, payable quarterly on the 16th days of July, October, January and April, the principal to be redeemable in the option of the company at any time after the 1st day of January, 1840."

The bond contains the further provision for conversion, optional on the part of the holder into shares of the capital stock of the company prior to January 1, 1840. After the time for conversion into stock had expired the holder brought an action to recover the amount of the bond. The court held that prior to January 1, 1840, the holder had no power to compel payment of the principal, and that the only obligation imposed upon the company was the payment of the interest according to the provisions of the bond. The court continues: " But how do the parties stand after that time, is the material question. There is due, &c., is the language of the certificate, to the lender the sum of $200, bearing an interest of six per cent. per annum, payable quarterly, &c., *the principal to be redeemable in the option of the company at any time after the 1st day of January*, 1840. This clause, we conceive, must be read as if written to be redeemable *only* at the pleasure of the company. The managers, reflecting that it might be inconvenient to return the principal at any precise time, contract for the privilege to redeem it at their pleasure; and hence the peculiar language of the certificate. The principal is

Municipal Court of New York, January, 1918.  [Vol. 102.

to be redeemable at the option of the company, and from this a necessary implication arises, that they shall not be *compelled* to redeem it.  The plaintiff's construction strikes these words, which were obviously inserted for the benefit of the company, entirely out of the contract; and it is not easy to see for what purpose they form part of it, if, as is contended, the plaintiff may at any time enforce the payment not only of the interest but of the whole amount loaned. On the latter construction the words ' redeemable in the option of the company ' are useless, as without them the company would have the right to pay the amount due at that time, and would be prevented from paying it before.  When the loan was effected, the disastrous termination of the affairs of the company was not foreseen.  It was supposed that, unlike a loan to an individual, there would be no difficulty in realizing the amount loaned by putting it into the market. * * *  No reason has been assigned for the introduction of the words ' to be redeemable in the option of the company,' unless on the supposition that they alone are to determine *when* the loan shall be repaid. Any other interpretation leads to inconsistent rights. It cannot be redeemable at the pleasure of one, and at the same time in the power of the other to compel a redemption.''

The reasoning in that case is controlling upon this. In fact, the language of the bond in the *Union Canal Co.* case would appear to be much stronger in favor of an immediate right to payment than the one herein. This defendant merely acknowledges that it has received from John Gibb the sum of $1,000 in payment of a subscription, while the Union Canal Co. bond certifies that *there is due* to the lender a certain sum.

The only case in this country wherein the legality

of irredeemable bonds has been questioned is *Taylor* v. *Philadelphia & Reading R. R. Co.,* 7 Fed. Repr. 386. For the purpose of raising money the railroad company after insolvency and the appointment of a receiver attempted to issue deferred income bonds which entitled the holder to a certain dividend and share in the profits after the payment of dividends to stockholders. The bonds were made irredeemable. The court held that in the absence of express legislative authority the company could not issue bonds of that character and that it was not covered by the authority conferred upon the company to borrow money. At page 390 the court says: " The money obtained by the defendant could not be regarded as borrowed, because that implies reimbursement, and it is not demandable by the subscribers or payable by the defendant. It has not the essential and distinguishing qualities of a loan." The court held in effect that the company under the guise of bonds was creating additional and unauthorized capital stock. The similarity of the *Taylor* case with the instant case is only superficial. Aside from other features the bond in this case is not irredeemable. The criticism of the court in the *Taylor* case that the loan is not payable by the defendant does not apply here. The chamber of commerce is not deprived of this right of redemption. It may exercise it at any time when it deems it for its best interests so to do. In addition, by its charter the incorporators of this company were given " full power and authority to erect and build, out of their common funds, or by any other ways or means, for the use of the corporation hereby created, any house, houses or other buildings as they shall think necessary and convenient." The words " or by any other ways or means " are sweeping, and cover the

Municipal Court of New York, January, 1918. [Vol. 102.

method adopted by the defendant in raising the funds for its building.

However, the force of the *Taylor* case as an authority has been weakened, if not overthrown, by *Philadelphia & Reading R. R. Co.'s Appeal,* 4 Am. & Eng. R. R. Cases, 118. The same bond, the issue of which was declared in the *Taylor* case as being beyond the power of the railroad company, was in the year following the decision of the Federal court held by the Supreme Court of Pennsylvania to be legally issued as an incident of the company's power to borrow money, notwithstanding that it took away the right of redemption. The reasoning of the court in upholding the legality of the bonds is strikingly applicable to this case. I therefore give the following extensive quotations from page 122, *et seq.:* " It is urged however, that this transaction is not a borrowing of money within the implied powers of the company; that the meaning of the word ' borrow ' as applied to moneyed transactions involves an obligation to return the sum or thing borrowed. This is a narrow view of the subject. It is true we often use this word in the sense of returning a thing borrowed, not specie, as to borrow a horse. But it is not limited to this sense."

After giving Webster's definition of " borrow," the court continues: " While the borrowing of money is usually accompanied with a contract for the return of the principal at a stated time, it is not always or necessarily so. The object of loaning money is to obtain a return in the way of interest. The interest is the consideration for the loan, the hire or price which is paid for the use of it. If I agree to pay $60 for the use of $1,000 for one year, it is a borrowing of money. It is equally so if I contract at the same rate for the use of it for ten years. Is it any the less so when the contract is perpetual and the loan irre-

deemable? The equivalent is paid only in the shape of interest.

" We do not think trade corporations, any more than individuals, are restricted in their moneyed transactions to the narrow meaning of the word ' borrow.' In its broader sense it implies a contract for the use of money. The terms of the contract are within the control of the contracting parties so long as they keep within the law. I see no legal objection to a contract for a perpetual loan. Such contract implies the voluntary advance of a sum of money, repayment of which is not to be demanded, presumably for some benefit or advantage to the lender. Such transactions are common in England, and are not unknown in this country. They are referred to in *Union Canal Co.* v. *Antillo*, 4 W. & S. 556, and in the *Appeal of the Zoological Society*, 38 Legal Intelligencer, 403, and I am informed that the annuity bonds of the Lehigh Valley R. R. Co. are irredeemable. So long as the company pays the interest the principal is not demandable. If the Reading R. R. Co. could not accept money from its stockholders as a perpetual loan, I am unable to see how it could accept it as a gift."

The following interesting comments upon the subject of perpetual loans, as applicable to American conditions, are made by an American author: " From the single standpoint of a debt, as such, being good business, one without any maturity would be ideal. Some English railroads do have perpetual debts, usually debentures of one form or another. American corporations have not commonly adopted such form of indebtedness. There are a few instances of it. For example, the Public Service Corporation of New Jersey, operating the traction lines in that populous section adjacent to New York city, has outstanding about $20,000,000 perpetual interest bearing certificates.

Municipal Court of New York, January, 1918. [Vol. 102.

Perpetual indebtedness does not, however, for the present, at any rate, accord with the American custom. As a *business* expedient it is of doubtful propriety. There are other considerations besides the merit of being in debt. American corporate creditors do not want to rely solely on the ' market ' for converting their assets into cash. They want an obligation to return the principal at a time certain, which they can wait for if they wish. Of course, this is notably true of that vast majority of smaller corporations whose securities never have an active market any way.'' Lyon on Capitalization, 146.

Since the trial of this case my attention has been called to a number of bond issues containing similar provisions to the one under consideration by a number of corporations of this country, which have been accepted without challenge. The provision for a perpetual loan in this case acquires an added significance when tested by the remarks quoted from the work of Professor Lyon. The loan was not made as a business venture. The interest return is so insignificant as to make the bond as an investment highly unattractive. The purpose of the subscribers was to aid the chamber of commerce to erect its building. Neither the land nor the building was given as security for the loan. Although the defendant distinctly disavowed the subscription to be a gift, it was nevertheless a subscription primarily for an altruistic purpose. It was not, as the plaintiff seems to believe, an oversight that a fixed date of payment was not inserted in the bond. On the contrary, the bond carries out the well considered intention of the subscriber, as well as the recipient. It would have been idle to have created a present liability or one shortly to become due. Such an arrangement would have availed the defendant nothing. The defendant did not have sufficient money to

buy the land and erect the building. To attain that end a loan was arranged upon the terms specified in the bond. It provided the defendant with a valuable asset which was not offset by a corresponding immediate liability or one payable within a short time. In interpreting the bond the court is limited to the conditions and obligations therein stated. We cannot read into the bond the right of the plaintiff to demand payment in advance of the happening of the contingencies stipulated in the bond. The subscribers knew what their rights were. They knew that they were entitled to receive a small return on their money and they knew that the defendant could redeem the bonds, but they also knew that they had not the right to demand the repayment of their subscription upon demand or within a reasonable time. The rights thus defined accord with the language of the bond. And in this case the letter of the bond squares with the ethics of the situation. In *Nellis* v. *Western Life Indemnity Co.,* 207 N. Y. 320, 332, the court quotes this passage from Kent's Commentaries: " The true principle of sound ethics is, to give the contract the sense in which the person making the promise believed the other party to have accepted it, if he in fact did so understand and accept it." The interpretation adopted by me has already been adopted by the subscribers to the fund. Seventeen years have elapsed since the issue of these bonds and not one subscriber has demanded the repayment of his subscription. The original owner of the bond involved in this action held it for four years until his death, his trustees for twelve years thereafter. The court may without impropriety infer that the trustees sold the bond at auction only for the purpose of winding up the estate. That during these many years not one dollar of this large sum, in excess of one million dollars, was ever demanded of the

defendant is convincing evidence of the practical construction of the agreement by the parties themselves. If there is any doubt as to the meaning of the contract entered into between the subscribers and the defendant, the parties themselves have resolved it in favor of the position taken by the defendant.

Assuming, without deciding, that the bond is a negotiable instrument, it was past due upon the plaintiff's own theory when acquired by him, and consequently all defenses available against the original holder may be interposed against the plaintiff. The complaint is dismissed on the merits.

Judgment accordingly.